1
2
3
4
5                    IN THE UNITED STATES DISTRICT COURT
6                    FOR THE EASTERN DISTRICT OF CALIFORNIA
7
8    G.M., a minor, by and through    )
     his Guardians ad Litem, KEVIN    )    2:10-cv-00944-GEB-GGH
9    MARCHESE and LYNDI MARCHESE;     )
     KEVIN MARCHESE, an individual,   )
10   and LYNDI MARCHESE, an           )    ORDER
     individual,                      )
11                                    )
                    Plaintiffs,       )
12                                    )
            v.                        )
13                                    )
     DRYCREEK JOINT ELEMENTARY SCHOOL )
14   DISTRICT,                        )
                                      )
15                  Defendant.        )
     _____)
16

17          Defendant  Drycreek  Joint  Elementary  School District

18   ("District") moves for summary judgment on each claim in Plaintiffs'

19   complaint. Plaintiffs' claims concern Plaintiff G.M.'s ("Student's")

20   education while he was enrolled in the District. Plaintiffs Kevin

21   Marchese and Lyndi Marchese (collectively "Parents"), and Student

22   (collectively "Plaintiffs") filed an opposition brief.

23          Plaintiffs' first claim is an appeal of the California Office

24   of Administrative Hearings ("OAH") administrative due process decision,

25   filed under the Individuals with Disabilities Education Improvement Act

26   ("IDEIA"). "A district court may review state administrative decisions

27   under the [IDEIA] by means of a motion for summary judgment." Sarah Z.

28   v. Menlo Park City Sch. Dist., No. C 06-4098, 2007 WL 1574569, at *3

                                    1

(N.D. Cal. May 30, 2007) (citing <u>Capistrano Unified Sch. Dist. v. Wartenberg ("Capistrano")</u>, 59 F.3d 884, 891-92 (9th Cir. 1995)). However, "[w]hile called a 'motion for summary judgment[,]' . . . the procedure is, in substance, an appeal from an administrative determination, not a summary judgment." <u>W.A. v. Patterson Joint Unified Sch. Dist. ("Patterson")</u>, No. CV F 10-1317, 2011 WL 2925393, at *8 (E.D. Cal. July 18, 2011). Since Plaintiffs' remaining claims are independent from their administrative appeal under the IDEIA, the traditional summary judgment standard applicable to Federal Rule of Civil Procedure ("Rule") 56 motions governs that portion of District's motion.

## I. APPEAL OF ADMINISTRATIVE DUE PROCESS DECISION

### A. Standard of Review Under the IDEIA

"When a party challenges . . . an IDEIA due process hearing, the reviewing court receives the administrative record, hears any additional evidence, and bases its decision on the preponderance of the evidence." <u>J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist. ("Fresno")</u>, 626 F.3d 431, 438 (9th Cir. 2010) (internal quotation marks and alteration in original omitted) (citing 20 U.S.C. § 1415(i)(2)(B)). "Based on this standard, 'complete de novo review of the administrative proceeding is inappropriate.'" <u>Id.</u> (quoting <u>Van Duyn v. Baker Sch. Dist. 5J</u>, 502 F.3d 811, 817 (9th Cir. 2007)). "As the party seeking relief in this Court, Student bears the burden of demonstrating that the [Administrative Law Judge's ('ALJ's')] decision should be reversed . . . [and] bears the burden of persuasion on each claim challenged." <u>Id.</u> (citing <u>Clyde K. v. Puyallup Sch. Dist., No. 3</u>, 35 F.3d 1396, 1399 (9th Cir. 1994)).

"In review of an [IDEIA] due process hearing, courts give 'less deference than is conventional in review of other agency

1  actions.'" Id. (quoting Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467,
2  1472 (9th Cir. 1993)).

3          How *much* deference to give state educational
           agencies, however, is a matter for the discretion
4          of the courts[.] . . . The court, in recognition of
           the expertise of the administrative agency, must
5          consider the findings carefully and endeavor to
           respond to the hearing officer's resolution of each
6          material issue. After consideration, the court is
           free to accept or reject the findings in part or in
7          whole.

8  Gregory K. V. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987)
9  (emphasis in original; internal quotation marks and citation omitted).

10         "'[D]ue weight' must be given to the administrative decision
11 below and . . . courts must not 'substitute their own notions of sound
12 educational policy for those of the school authorities which they
13 review.'" Van Duyn, 502 F.3d at 817 (quoting Bd. of Educ., Hendrick
14 Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley ("Rowley"), 458
15 U.S. 176, 206 (1982)). Further, the "Court gives deference to an ALJ's
16 decision when it evinces his [or her] careful, impartial consideration
17 of all the evidence and demonstrates his [or her] sensitivity to the
18 complexity of the issues presented." Fresno, 626 F.3d at 438 (internal
19 quotation marks, alterations in original, and citations omitted).

20         "A district court should accept the ALJ's credibility
21 determinations unless the non-testimonial, extrinsic evidence in the
22 record would justify a contrary conclusion." K.S. ex rel. P.S. v.
23 Fremont Unified Sch. Dist. ("Fremont"), 545 F. Supp. 2d 995, 1003 (N.D.
24 Cal. 2008) (internal quotation marks and citation omitted). Further,
25 "'[b]ecause [IDEIA] eligibility determinations are fact-intensive,' the
26 Court 'reviews findings of fact for clear error, even if those findings
27 are based on the administrative record.'" Patterson, 2011 WL 2925393, at
28 *8.

**B. Background**

    **1. Statutory Framework**

        "The [IDEIA] is a comprehensive educational scheme, conferring on disabled students a substantive right to public education." Fresno, 626 F.3d at 432 (internal quotation marks and citation omitted). "The [IDEIA] ensures that 'all children with disabilities have available to them a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.'" Id. (quoting 20 U.S.C. § 1400(d)(1)(A)). Under the IDEIA, a FAPE is defined as:

        special education and services that—(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the school standards of the State educational agency; (C) include an appropriate preschool, elementary school or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program [("IEP")] required under section 1414(d) of this title.

20 U.S.C. § 1401(9). "To provide a FAPE in compliance with the [IDEIA], a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education and services, conduct and implement an IEP, and determine an appropriate educational placement of the student." Fresno, 626 F.3d at 432 (citing 20 U.S.C. § 1414).

        "Student's FAPE must be 'tailored to [his] unique needs . . . by means of an . . . IEP.'" Id. (quoting Rowley, 458 at 206). An IEP "is crafted by an IEP team made up of the parents, at least one regular education and one special education teacher of [the student], a representative of the local educational agency, and, at the discretion

1  of the district or the parent, others knowledgeable about the

2  [student]." E.P. v. San Ramon Valley Unified Sch. Dist., No. C05-01390,

3  2007 WL 1795747, at *1 (N.D. Cal. June 21, 2007) (citing 20 U.S.C. §

4  1414(d)(1)(B)). "An IEP team must set forth the IEP in a writing

5  comprised of a 'statement of annual goals and short-term instructional

6  objectives; a statement of the specific educational services to be

7  provided and the extent to which the child can participate in regular

8  education programs; and objective criteria for measuring the student's

9  progress.'" Id. (quoting Ojai, 4 F.3d at 1469); 20 U.S.C. §

10  1414(d)(1)(A).

> Violations of the [IDEIA] may arise in two situations. First, a school district, in creating and implementing the IEP, can run afoul of the Act's procedural requirements. Second, a school district can be liable for a substantive violation by drafting an IEP that is not reasonably calculated to enable the child to receive educational benefits.

16  Fresno, 626 F.3d at 432 (internal citations omitted). Here, Plaintiffs

17  allege both procedural and substantive violations of the IDEIA.

18      **2. Factual Background**

19      The following uncontroverted facts are taken from the ALJ's

20  Decision, the administrative record, and testimony from the

21  administrative due process hearing. At all relevant times, Student

22  resided with Parents in the District. (ALJ Decision ¶ 1 (findings).)

23  "Student [has] receive[d] special education and related services because

24  of a specific learning disorder (dyslexia)" since the first grade. Id.;

25  Barbaria Test., Hr'g Trans. 93:16-18, Nov. 30, 2009. "He has deficits in

26  reading, writing, math, and working memory." (ALJ Decision ¶ 1

27  (findings).)

28  //

"[Parents and District] were unable to agree on an IEP for Student for his sixth grade year ([2008-2009]), so [P]arents filed a request for [a] due process hearing" in 2008. Id. ¶ 2. "In October 2008, the matter was settled by a written agreement [('2008 Settlement Agreement'), which] placed Student, for his sixth grade year, with an outside reading tutor[, Suzanne Coutchié ('Coutchié'),] for three hours a day at District expense, and in physical education (['P.E.']) for one hour a day at . . . District's Creekview Ranch Middle School." Id. From August 2008 until the ALJ rendered his Decision in this matter, "Student's school day . . . consisted of being driven to [Coutchié's] home in Davis for three hours of reading tutoring, and then to school for one hour of [P.E.]" Id. ¶ 10.

"District employees last assessed Student['s academic abilities] in spring 2008 for his triennial review." Id. ¶ 5. "In April 2009, . . . District proposed an assessment plan to Parents, and sought [their] permission for academic reassessments of Student[.]" Id. "The day after [Parents] received the April 2009 assessment plan, [Lyndi Marchese] discussed it with [Coutchié], who proposed to do the assessments herself." Id. ¶ 6. Parents consented and Coutchié "conducted academic assessments of Student in late April and early May 2009." Id. ¶¶ 5 & 7. "Coutchié billed . . . District for the assessments, but [billed them] as ordinary instructional time, not as time for assessments, and . . . District paid the bill, not knowing it was for assessments." Id. ¶ 6. "District did not learn that it had paid [Coutchié] for her assessments until the [administrative due process] hearing." Id. "After [Coutchié] conducted these assessments, [she], Parents, and . . . [Student's advocate in the administrative due process proceedings, Michael Rosenberg ("Rosenberg"),] had many subsequent

contacts with District staff, but did not reveal the existence or the results of [Coutchié's] assessments to . . . District . . . until late August 2009, when [Coutchié] produced them in response to a subpoena duces tecum[.]" Id. ¶ 7.

"[T]he [2009-2010] school year [was scheduled to begin] on August 10, 2009[.]" Id. ¶ 50. "District convened Student's regularly scheduled annual IEP meeting on May 28, 2009." Id. ¶ 22. The following individuals attended the May 28, 2009 IEP meeting: Parents; Coutchié; Rosenberg; District's Director of Special Education, Lynn Barbaria ("Barbaria"); a resource specialist teacher in the District, Megan Williams; District's then-legal counsel, Jacqueline McHaney; and four other District staff members. (A.R. 1214.) "[A]t the end of the May 28, 2009 meeting, [District] promised to deliver a written IEP offer to [Rosenberg] on June 5, 2009[.]" (ALJ Decision ¶ 37 (findings).) However, District failed to deliver an IEP offer to Rosenberg by June 5, 2009, and Plaintiffs filed their administrative due process complaint on June 11, 2009. Id. at p.1.

"On July 2, 2009, [District] began to make a series of requests of Parents that they identify dates on which they would be available for an IEP meeting to make [District's IEP] offer final." Id. ¶ 43. "Neither Parents nor [Rosenberg] responded to those requests." Id. "On July 27, 2009, [Barbaria] mailed a draft IEP to Parents, along with a new assessment proposal." Id. ¶ 44. On July 30, 2009, Barbaria sent written notice to Parents that another IEP meeting was scheduled for the following Wednesday, August 5, 2009. Id. ¶ 45.

"On Tuesday, August 4, 2009, Parents . . . [sent a letter to District stating] they would not attend the August 5 meeting." Id. ¶ 46. Parents also stated "the most important reason they would not attend the

August 5 meeting was that [they] . . . were in litigation" with District. Id. ¶ 66. "[Parents] argued [in the letter] that open discussion would be impossible; that the meeting would have an impact on the litigation; and that they '[would] be denied due process rights and sustain harm if [District] attempt[ed] to scheduled an IEP meeting while due process litigation [was] pending.'" Id.

District staff held the August 5, 2009 IEP meeting without Parents or Coutchié. (Barbaria Test., Hr'g Trans. 171:18-172:18, Nov. 30, 2009.) Barbaria sent a letter and a draft IEP offer to Parents following the meeting. Id. at 187:7-17. "[Subsequently, District] decided to hold another IEP meeting that Parents could attend." (ALJ Decision ¶ 51 (findings).) "On August 14, [District] sent Parents a notice of an IEP meeting [scheduled for] August 28." Id. "Parents, [Rosenberg], and [Coutchié] attended, as did all District staff required by the statute." Id. At the August 28, 2009 IEP meeting, "Parents refused to discuss the details of . . . District's [IEP] offer, stating that they believed such a discussion was inappropriate while the matter was in litigation." Id. ¶ 55.

"The IEP offer that emerged from the August 28, 2009 IEP meeting would have placed Student . . . at [District's] Silverado Middle School for his seventh grade year [(2009-2010)]." Id. ¶ 71. "The offered program consisted of: two periods a day of one-to-one language arts instruction with a District special education teacher trained and experienced in addressing significant reading deficits, including dyslexia; two periods a day of small group math instruction . . . ; one period a day of sixth grade science in a general education class with the support of an instructional assistant . . . ; one period a day of [P.E.]; one Advisory period a day; ten 30-minute sessions a year of

speech and language therapy to address social skills; ten 30-minute consultations a year by an occupational therapist to support keyboarding instruction; and an extended school year." Id.; Admin. R. ("A.R.") 1211.

"The offer included an extensive list of accommodations and modifications." (ALJ Decision ¶ 72 (findings); A.R. 1188-1216.) "It also included use of, and training for, a Kurzweil 300, a computer device for people with dyslexia and other reading deficits that simultaneously highlights text from scanned books or electronic text and reads it aloud using synthetic speech." (ALJ Decision ¶ 72 (findings); A.R. 1188-1216.) "The IEP offer proposed that Student's reading teacher, Lesley Ludwig, would consult with Dr. [Lela Catherine] Cristo [("Cristo"), who conducts educational assessments for District,] in the development of the specifics of Student's reading program as soon as his present performance and limitations could be determined" through more current assessments. Id. ¶ 73. "It also offered monthly IEP team meetings to monitor Student's progress." Id.

## 2. Administrative Due Process Hearing and Decision

Plaintiffs filed a request for a due process hearing on June 12, 2009 in OAH Case No. 2009060940. (A.R. 1-7.) District filed a request for a due process hearing on July 31, 2009 in OAH Case No. 2009071109, which was consolidated with OAH case No. 2009060940. Id. at 151-53. ALJ Charles Marson ("the ALJ") conducted an administrative due process hearing on November 30 and December 1, 2, 8, 9, and 10, 2009. The ALJ ruled on the following issues in his February 18, 2010 Decision ("Decision"):

*Student's Issues (OAH Case No. 2009060940):*

1) Whether [District] failed to accord Parents meaningful participation in the IEP process at and after the May 28, 2009 IEP meeting because it failed to deliver a written IEP offer by June 5,

2009, as it had promised, or by a reasonable time thereafter;

2) Whether [District] failed to accord Parents meaningful participation in the IEP process at the May 28, 2009 IEP meeting because several members of the IEP team were unfamiliar with Student; and

3) Whether [District] denied Student a FAPE by failing to make a timely offer of a [FAPE] for the . . . 2009-2010 [school year].

*District's Issues (OAH Case No. 2009071109):*

1) Whether [District] may assess Student in accordance with the assessment plan and related correspondence presented to Parents on or about April 2009 and July 2009; and

2) Whether [District's] most recent IEP offer constituted an offer of a FAPE for Student for the . . . 2009-2010 [school year].

(ALJ's Decision p. 2.) The ALJ found in favor of District on all issues. Id. ¶¶ 5, 21-23 & 31-34 (conclusions). In addition, the ALJ granted in part and denied in part District's motion for attorneys' fees against Kevin Marchese. Id. at p.50.

**C. Discussion**

The Court has reviewed the entire record, which includes the administrative record, the hearing transcripts, and the parties' arguments and authorities. Neither party requested to present additional evidence concerning the administrative appeal.

The ALJ rendered his 51-page Decision following a six-day hearing in which he actively participated. During the hearing, the ALJ sought clarification and follow-up responses from the witnesses. The ALJ accurately and completely described in his Decision the relevant witness testimony and other evidence in the administrative record. In addition, the ALJ discussed the qualifications of the witnesses on whom he relied, explained the facts supporting his credibility determinations, applied

the relevant law, and thoroughly explained his legal conclusions. Therefore, the Court finds the ALJ's Decision to be thorough, well-reasoned, and entitled to substantial deference.

**1. ALJ's Alleged Procedural Errors**

**a. Failure to Consider California Department of Education ("CDE") Compliance Reports Concerning Procedural Violations**

Plaintiffs allege in their First Amended Complaint ("FAC") that the ALJ "fail[ed] to consider and accept . . . the findings of numerous CDE compliance [reports] which demonstrated the CDE's recognition of ongoing systemic and individual violations by [District] against Student and his family." (FAC ¶ 74(R).)

The administrative record contains three CDE compliance reports. The CDE found in its September 22, 2009 compliance report that District violated California Education Code sections 56502(d)(2) and 56501.5(a)(1) by failing to respond to Parents' administrative due process complaint within ten days and failing to hold a resolution session within fifteen days. (A.R. 960-70.) Similarly, the ALJ found that "Federal and State law required that, within ten days of receiving a due process complaint, a district must 'send to a parent' a 'response' to the complaint[,] . . . [but] District did not send Parents a response to their June 11, 2009, complaint until July 28, 2009." (ALJ Decision ¶¶ 158-59 (findings).) Since the ALJ's finding was consistent with the CDE's compliance report, Plaintiffs have not demonstrated that the ALJ erred.

The CDE found in its October 9, 2009 compliance report that District violated federal regulations by "[f]ail[ing] to continue [Student's] current placement [for P.E.] during the pendency of [the]

administrative . . . due process proceeding." (A.R. 971-79.) However, Student's P.E. placement from the 2008 Settlement Agreement was not at issue in the administrative due process proceedings. Therefore, Plaintiffs have not demonstrated the ALJ erred by failing to consider the October 9, 2009 CDE compliance report.

The CDE found in its November 9, 2009 compliance report that District violated the California Education Code and federal regulations concerning the August 5, 2009 IEP meeting by failing to "ensure [Parents the] right to present information to the IEP team"; "ensure [Parents were] fully informed of all information"; "notify [P]arents of IEP team meeting early enough to ensure that they will have an opportunity to attend"; and "include all required team members in the IEP meeting[.]" (A.R. 980-1008.) The ALJ concluded in his Decision that District committed the same violations and stated he "independently agree[d] with [the CDE's] findings." (ALJ Decision ¶ 31 (conclusions); id. at p.12 n.4.) Therefore, Plaintiffs have not demonstrated the ALJ erred.

### b. Alleged Violation of ALJ's "Standing Order"

Plaintiffs argue that "without a stipulation [to amend its due process complaint from Plaintiffs], [District] could not bring[,] nor could the [ALJ] consider[,] the 'new' issues pertaining to the contrived August 28, 2009 IEP meeting and the necessarily unlawful offer of FAPE generated thereon, since it was a new issue barred by the [ALJ's 'standing order'] and the [IDEIA]." (Opp'n 21-22; FAC ¶¶ 74(D)-(E) & (G).)

The ALJ's "standing order" states in relevant part:

> Issues: The hearing shall be limited to the issues raised in the due process complaint notice. You will not be permitted to raise other issues unless the other party . . . agrees.

1  (A.R. 146.)

2        The evidence in the administrative record demonstrates that
3  District first included the August 28, 2009 IEP meeting in its "Issue
4  No. 2" when it filed its Second Amended Pre-Hearing Conference Statement
5  on November 18, 2009. (See A.R. 573 (District's Second Amended Pre-
6  Hearing Conference Statement); id. at 244 (District's August 18, 2009
7  amended due process complaint).) The ALJ incorporated the August 28,
8  2009 IEP meeting into his statement of District's Issue No. 2 in his
9  Order Following Pre-Hearing Conference filed on November 24, 2009. Id.
10 at 608.

11       However, Plaintiffs did not object to District's addition of
12 the August 28, 2009 IEP meeting to its Issue No. 2 before or during the
13 pre-hearing conference on November 23, 2009; in their motions in liminé
14 dated November 25, 27, and 29, 2009; or during the first day of the
15 administrative due process hearing, during which District's counsel
16 described the August 28, 2009 IEP meeting in her opening statement and
17 two witnesses testified in detail about what occurred at that meeting.
18 (See Hr'g Trans. Nov. 23, 2009 (transcript of pre-hearing conference);
19 A.R. 617-54 & 666-69 (Plaintiffs' motions in liminé); Hr'g Trans. 28:11-
20 29:7 (District's opening statement); Barbaria Test., Hr'g Trans. 173:21-
21 181:14, 193:8-209:9, Nov. 30, 2009; Williams Test., Hr'g Trans. 236:2-
22 239:4, Nov. 30, 2009.)

23       Plaintiffs first objected to the introduction of evidence
24 concerning the August 28, 2009 meeting on the second day of the
25 administrative due process hearing. (Hr'g Trans. 8:2-11:10, Dec. 1,
26 2009.) After hearing oral argument regarding Plaintiffs' objection, the
27 ALJ stated, in relevant part:

28         I'm going to amend the statement at issue . . . .
        In my view, that does not change the issue. . . .

> It will now read, "whether the District's most
> recent IEP offer constituted an offer of FAPE to
> Student for the school year 2009-2010." . . . [N]ot
> only is it my memory that [Plaintiffs] did not
> object to this at the pre-hearing conference, but
> we had considerable evidence yesterday . . . to
> which [Plaintiffs] could have objected on this
> ground and did not.

(Hr'g Trans. 18:13-21, 19:3-12, Dec. 1, 2009.) The ALJ upheld this ruling when he rendered his Decision. (See ALJ Decision 36 n.10 (denying Plaintiffs' motion for reconsideration concerning his ruling from the bench).)

The California Code of Regulations, which implements the IDEIA's procedural safeguards concerning administrative due process hearings, prescribes in relevant part:

> The hearings conducted pursuant to this section
> shall not be conducted according to the technical
> rules of evidence and those related to witnesses.
> Any relevant evidence shall be admitted if it is
> the sort of evidence on which responsible persons
> are accustomed to rely in the conduct of serious
> affairs, regardless of the existence of any common
> law or statutory rule which might make improper the
> admission of such evidence over objection in civil
> actions.

Cal. Code. Regs., tit. 5, § 3082(b). In addition, the IDEIA permits amendment of a due process complaint with the ALJ's permission or consent of the opposing party. 20 U.S.C. § 1415(c)(2)(E).

Plaintiffs have not demonstrated that the ALJ exceeded his authority under the California Code of Regulations or the IDEIA by amending District's Issue No. 2 to reflect the August 28, 2009 IEP meeting. The evidence demonstrates that the August 28, 2009 IEP meeting was relevant to the issue of whether District violated the IDEIA by failing to develop an IEP that would provide Student with a FAPE for the 2009-2010 school year. Therefore, Plaintiffs have not demonstrated the

ALJ erred by allowing the introduction of testimony and evidence concerning the August 28, 2009 IEP meeting.

Further, Plaintiffs do not argue they were prejudiced by the introduction of evidence concerning this issue; nor would the record support such an argument, since Plaintiffs did not timely object to the introduction of evidence concerning the August 28, 2009 IEP meeting and Plaintiffs' witnesses testified extensively regarding the appropriateness of the IEP generated at the August 28, 2009 meeting. (See Coutchié Test., Hr'g Trans. 63:15-94:22 & 126:12-131:22, Dec. 8, 2009; Torgesen Test., Hr'g Trans. 61:2-82:18 & 111:10-119:10, Dec. 9, 2009.)

### c. Plaintiffs' Requests for Default Judgment

Plaintiffs argue District "should have been precluded from submitting a defense in the administrative case" and the ALJ should have entered default judgment against District because District failed to respond to Plaintiffs' June 11, 2009 due process complaint within ten days. (Opp'n 12-18.) The ALJ referred to this argument in his Decision as the "sudden death argument," because "Parents argued . . . that [District's] delay in filing a response meant 'sudden death' to [District's] position in any litigation concerning Student before OAH." (ALJ Decision ¶ 159 (findings).)

Under the IDEIA, a district that receives a copy of a due process complaint must, "within 10 days of receiving the complaint, send to the parent a response that shall include . . . an explanation of why the agency proposed or refused to take the action raised in the complaint; . . . a description of other options that the IEP Team considered and the reasons why those options were rejected; . . . a description of each evaluation procedure, assessment, record, or report

the agency used as the basis for the proposed or refused action; and . . . a description of the factors that are relevant to the agency's proposal or refusal." 20 U.S.C. § 1415(c)(2)(B).

The ALJ rejected the "sudden death argument" for the following reasons:

> a) A statute that says "send to the parent" does not mean "file." Since the statute only requires a response to a parent if a prior written notice has not been sent, its apparent purpose is to ensure that parent is informed, not that litigation is furthered.
>
> b) An answer serves a central role in civil litigation and is required by statute, court rule, and decisional law, which authorize dismissal if an answer is not filed. The response to a parent plays no role in due process litigation, and an ALJ is not authorized to act on a failure to send one.
>
> c) No authority remotely supports the sudden death argument, and [Plaintiffs] cited none. Although an attorney may make a good faith argument for change in the law, [Plaintiffs] did not make such an argument, or advance any policy reason in support of his claim.
>
> d) There is a complete and adequate administrative remedy in the IDEA for failure to send a parent response. A parent my file an administrative complaint with the California Department of Education (CDE) . . . . Any reasonable lawyer in [Plaintiffs'] position would have felt obliged to offer at least some reason why that remedy might be inadequate. [Plaintiffs] did not make that attempt, or acknowledge . . . that he was simultaneously pursing that remedy with CDE.
>
> e) An administrative hearing under the [IDEIA] is designed to be much less formal than a civil case. A party whose complaint states a plausible reasonably detailed claim under [the IDEIA] is generally entitled to a hearing. The broad remedial purpose of the [IDEIA] is to encourage sound educational programming for disabled children, not to set fatal procedural traps for the parties.

Id. ¶ 161.

//

Plaintiffs challenge the ALJ's rejection of their "sudden death argument," arguing the IDEIA "requires a detailed, written response within ten days, indicating the importance Congress gave to the necessity of not just a response, but a timely and prompt response . . . [and e]ntering default will give effect to the statute's purpose[.]" (Opp'n 18.) Plaintiffs argue Massey v. District of Columbia, 400 F. Supp. 2d 66 (D.D.C. 2005), supports their argument. In Massey, the court held plaintiffs were not required to exhaust their administrative remedies under the IDEIA before filing a complaint in federal district court because they demonstrated administrative exhaustion would be futile. 400 F. Supp. 2d at 74. However, Massey is distinguishable, since the plaintiffs in Massey did not seek to completely preclude the school district from defending against their IDEIA claims as Plaintiffs do here. (See A.R. 86-88 (Plaintiffs' Motion for Summary Adjudication, seeking judgment against District for failing to timely answer their due process complaint).)

Further, "the [IDEIA] does not specify default as the penalty for failure to serve an appropriate response to a Due Process Complaint Notice." Sykes v. District of Columbia, 518 F. Supp. 2d 261, 267 (D.D.C. 2007). "The purpose of the response requirement seeks to guarantee meaningful parental participation in the student placement process." Id. "A default judgment would . . . subvert[] the administrative process and [result in the] assign[ment of Student to] a placement without a full examination of the record or his needs." Id. Therefore, Plaintiffs have not demonstrated the ALJ erred when he denied their repeated requests for default judgment against District.

//

//

### d. ALJ's Award of Attorneys' Fees

Plaintiffs argue the ALJ erred by awarding attorneys' fees to District as reimbursement for responding to Kevin Marchese's repeated assertions of the "sudden death argument." (Opp'n 16.) District argues attorneys' fees were appropriate. (Def.'s Mot. for Summ. J. ("Mot.") 33:14.)

The ALJ found "[Kevin Marchese's] sudden death argument was frivolous because it was totally and completely without merit [for the reasons stated above]." (ALJ Decision ¶ 161 (findings).) The ALJ found Kevin Marchese "knew the argument had no merit" when he argued it in Plaintiffs' second due process complaint, filed on July 23, 2009, since the ALJ in the 2008 due process proceedings ruled that OAH hearing officers did not have authority to enter default judgment. Id. ¶ 162(b). The ALJ found that "[h]aving once lost the argument, any reasonable attorney would have abandoned it[, but Kevin Marchese] . . . repeated it, not waiting for rulings on early efforts before filing later ones." Id. ¶ 162(c).

The ALJ found Kevin Marchese "pursued the 'sudden death argument'" in the following filings: Plaintiffs' second due process complaint filed July 23, 2009; Plaintiffs' motion to strike District's response to Plaintiffs' first due process complaint notice, filed July 30, 2009; Plaintiffs' motion for summary adjudication filed July 30, 2009; Plaintiffs' opposition brief to District's notice of insufficiency, filed August 3, 2009; Plaintiffs' opposition to District's motion to dismiss, filed August 30, 2009; and Plaintiffs' request for clarification, which the ALJ treated as a motion for reconsideration, filed September 28, 2009. Id.

//

The ALJ also found "[t]he pleadings for which [District] seeks sanctions are part of a larger record in these matters of repeated, unnecessary, and arguably frivolous filings, motions, and objections by [Kevin Marchese] that substantially increased [District's] litigation costs." Id. ¶ 162(d). The ALJ found "[t]he preponderance of the evidence showed that circumstances exist to support the inference that [Kevin Marchese] made and pursued the sudden death argument for an improper purpose . . . [and] that he acted solely with the intent to harass [District] by filing voluminous, unnecessary, and frivolous pleadings, thereby causing [District] to incur substantial additional litigation costs." Id.

The ALJ specifically found:

> Having run up [District's] legal bills, [Kevin Marchese] attempted to exploit those expenses to obtain victory in the litigation. On October 1, 2009, he wrote to [District's] School Board, stating that the two issues OAH had dismissed "will be submitted to other agencies for investigation." He then wrote:
>
>> Another prediction we made has also come true. It is clear that [District] has used more time and dollars than it would have cost for a year of services for our son. This is bad policy and can be stopped by the Board. There are several investigations by both State and Federal entities pending. The Office of Civil Rights is investigating . . . .
>
> In his letter to the School Board, [Kevin Marchese] then threatened that Parents would "submit several issues for criminal investigation", and predicted that the hearing before OAH would take as many as 20 days and involve 37 witnesses, which it did not. He reiterated that "[w]in or lose[,] the costs involved will exceed an additional year of services for our son", and stated that [District's] continuing resistance would be "an outrage to taxpayers" and "fiduciary irresponsibility" on the part of the Board. He closed by stating that the dispute "may take years to resolve." The unmistakable meaning of [Kevin Marchese's] letter was that Parents had already caused [District] to spend an inordinate amount of money, and that, if

19

                    [District] did not abandon its position, Parents
                    would ensure that the cost of resistance would be
                    greater still.

Id. ¶ 162(e)-(f). The ALJ awarded District $3,880 in attorneys' fees as

reimbursement for "opposing Student's frivolous filings[.]" Id. ¶ 168;

id. at p.50.

        Plaintiffs argue "the subsequent due process action filed in

July 2009 could not have been frivolous by any stretch of the

imagination." (Opp'n 17). However, for the stated reasons by the ALJ,

Plaintiffs' "sudden death argument" lacks merit. Therefore, Plaintiffs

have not demonstrated the ALJ's factual finding that Kevin Marchese

repeatedly raised the "sudden death argument" for an improper purpose

was clearly erroneous. Accordingly, the ALJ's award of attorneys' fees

is affirmed.

                    **e. ALJ's Alleged Bias**

        Plaintiffs argue the ALJ was biased. (Opp'n 17.) "ALJs and

other similar quasi-judicial administrative officers are presumed to be

unbiased." Haseltine v. Astrue, 668 F. Supp. 2d 1232, 1234 (N.D. Cal.

2009) (citation omitted). To show bias, "Plaintiff[s] must rebut this

presumption by showing a conflict of interest or some other specific

reason for disqualification[;] [j]udicial rulings alone almost never

constitute evidence of bias." Id. Further, "Plaintiff[s] must show that

the ALJ's actions were 'so extreme as to display clear inability to

render fair judgment.'" Id. (quoting Rollins v. Massanari, 261 F.3d 853,

858 (9th Cir. 2001)).

        Plaintiffs argue the "ALJ's decision that [Kevin Marchese's

repeated assertion of the 'sudden death argument' was] frivolous and

'intended solely to harass' . . . suggests an objectively discernable

bias by the ALJ." (Opp'n 17.) However, the ALJ's rejection of the

"sudden death argument," is upheld under the preponderance of the evidence standard. Plaintiffs also argue in a footnote that the ALJ or the "transcription clerk's" alteration of the administrative record "to reflect the Plaintiff/Party-Parent/Father's professional address and status as an attorney (which was never given)" is evidence of bias. (Opp'n 17 n.1.) However, Plaintiffs have not provided evidence supporting this argument.

Plaintiffs have not demonstrated "that the ALJ's actions were so extreme as to display clear inability to render fair judgment." Haseltine, 668 F. Supp. 2d at 1234. Therefore, Plaintiffs have failed to show the ALJ was biased.

## 2. Substantive Issues

### a. Right to Reassess Student

The ALJ ordered that District was allowed to reassess Student's academic abilities, since District "demonstrated that Student's educational and related services needs warrant a reevaluation of Student, as proposed by [District] in its April 2009 assessment plan and related documents[.]" (ALJ Decision ¶ 5 (conclusions).) The ALJ based this conclusion on his findings that "[Student] ha[d] not been instructed or tested in any academic subject since August 2008, so there [were] none of the usual test scores, report cards, . . . teacher reports[,] . . . [or other] kinds of academic information that usually supplement or substitute for assessments"; and "[t]he most recent assessment information about Student [was] obsolete." Id. ¶ 10 (findings). ALJ based his finding that the most recent assessment information was obsolete on the testimony of both parties' expert witnesses.

//

Plaintiffs do not challenge this portion of the ALJ's Decision. However, the ALJ accurately described the relevant portions of the witnesses' testimony, and a preponderance of the evidence supports his findings and conclusions concerning the need for reassessment.

### b. Procedural Compliance With the IDEIA

Plaintiffs argue District did not make a valid IEP offer for the 2009-2010 school year since it failed to comply with IDEIA's procedural requirements. Plaintiffs specifically argue District failed to make a valid IEP offer since it failed to deliver a written IEP offer by June 5, 2009 as it promised; and the August 28, 2009 IEP meeting was untimely and therefore unlawful. (Pls.' Opp'n ("Opp'n") 6-7, 11, 19-21; Pls.' First Am. Compl. ("FAC") ¶¶ 74(F) & (J).) Since Plaintiffs do not challenge the ALJ's remaining conclusions concerning District's procedural compliance with the IDEIA, those conclusions are not discussed below. However, the court has reviewed the hearing testimony and the administrative record and finds that a preponderance of the evidence supports the ALJ's conclusions.

### i. Failure to Deliver IEP Offer by June 5, 2009

Plaintiffs argue that at the conclusion of the May 28, 2009 IEP meeting, Barbaria and District's then-legal counsel, Jacqueline McHaney, agreed to deliver a written IEP offer to Rosenberg on June 5, 2009, but failed to do so. (Opp'n 6.) Plaintiffs argue that by promising to deliver the May 28, 2009 IEP offer by June 5, 2009, District agreed to provide the IEP offer on shortened time and thus "waive[d the opportunity to] . . . deliver an offer of FAPE by the commencement of the academic year[,]" August 10, 2009. Id. at 19. Plaintiffs further argue that since the May 28, 2009 IEP offer was not delivered by June 5, 2009, a valid "[IEP] offer was never made under the IDEA." Id. at 7.

Plaintiffs specifically argue an "agreement to shorten a statutory time within which to provide or fulfill a particular statutory obligation (i.e., an agreement to provide an offer of FAPE by June 5, 2009, instead of by the commencement date of . . . school on August 10, 2009) is enforceable as an agreement" under California Civil Code section 3268 ("section 3268"). (Opp'n 7.) District counters that section 3268 only governs "obligations arising from 'particular transactions' including consignment of fine art, credit sales, and recording artist contracts[.]" (Def.'s Reply ("Reply") 4:23-5:1.)

Section 3268 states:

> Except where it is otherwise declared, *the provisions of the foregoing titles of this part*, in respect to the rights and obligations of parties to contracts, are subordinate to the intention of the parties, when ascertained in the manner prescribed by the chapter on the interpretation of contracts; and the benefit thereof may be waived by any party entitled thereto, unless such waiver would be against public policy.

Cal. Civ. Code § 3268 (emphasis added). Section 3268 only applies to "Part 4" of the Civil Code, entitled "Obligations Arising from Particular Transactions," none of the titles in which concern special education law. Id. Further, all that "[t]he [IDEIA] and California Education Code require [is] that . . . [District] have in effect an IEP for each child with a disability" "*at the beginning of each school year*[.]" Patterson, 626 F.3d at 460 (emphasis added) (citing 20 U.S.C. § 1414(d)(2)(A)); Cal. Educ. Code § 56344(b). Therefore, Plaintiffs have not demonstrated District violated the IDEIA's procedural requirements when it failed to deliver a written IEP by June 5, 2009, or that the ALJ's finding should be reversed.

//

//

**ii. Procedural Validity of August 28, 2009 IEP Offer**

Plaintiffs argue "[a]ny offer of [an IEP] after [the first day of the 2009-2010 school year, August 10, 2009], would be untimely and therefore unlawful[,]" since the "[IDEIA] requires offers of FAPE to be in place prior to the commencement of the upcoming academic year[.]" (Opp'n 20 (citing 34 C.F.R. § 300.323).)

The [IDEIA] requires a school district to have an IEP in effect for each student with a disability "[a]t the beginning of each school year." 20 U.S.C. § 1414(d)(2)(A). "Compliance with the [IDEIA] procedures is essential to ensuring that every eligible child receives a FAPE[.]" <u>Vashon Island</u>, 337 F.3d at 1129 (internal quotation marks and citation omitted).

> Not every procedural violation, however, is sufficient to support a finding that the child in question was denied a FAPE. Technical deviations, for example, will not render an IEP invalid. On the other hand, procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits, clearly result in the denial of a FAPE.

<u>Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.</u>, 267 F.3d 877, 892 (9th Cir. 2001) (internal quotation marks and citations omitted).

The ALJ concluded that "District failed to make a timely offer of a FAPE for Student for the [2009-2010 school year], but its delay in doing so did not deny Student a FAPE . . . [since] he remained in the placement required by the [2008 Settlement Agreement]." (ALJ Decision ¶ 23 (conclusions).) The ALJ further concluded "Parents' participatory rights were unaffected because they had only a single placement in mind; had no interest in assisting [District] to develop another proposal; never participated in that effort when they had opportunities to do so;

and were obstructing the development of [District's] proposal by withholding needed information." Id.

The ALJ based these conclusions on the following factual findings:

> 63. The preponderance of the evidence showed that Parents were unwilling to participate in the August 5, 2009 IEP meeting for reasons having nothing to do with adequate notice. Throughout these events Parents have steadfastly maintained that continuation of Student's placement with [Coutchié] is the only program that can provide him a FAPE for [the] 2009-2010 [school year]. Parents remain adamant in their conviction that Student is not ready to return to public school or be exposed to the usual curriculum of middle school until his reading approaches grade level, and that for now his education should concentrate solely on that goal.

> 64. Accordingly, at all times relevant here, Parents have been unwilling to cooperate with the District in the development of any offer of a FAPE that competes with their own vision of what is required. Parents have had no interest in helping the District develop any offer that would separate Student from [Coutchié] or return him to public school, and have actively obstructed that effort by denying [District] useful information about Student's present levels of academic performance.

> 65. The stated purpose of the August 5, 2009 IEP meeting was to finalize the District's offer of a FAPE. Parents knew or suspected, from the draft sent to them on July 27, 2009, that the offer would propose that Student return to public school. The evidence showed that Parents avoided attending the meeting, giving various explanations of their unavailability to the District. Notwithstanding the inadequate notice of the August 5 meeting, Parents could have attended the August 5, IEP meeting but chose not to attend.

> 66. On August 4, 2009, Parents wrote in a letter to [District] that the most important reason they would not attend the August 5 meeting was that Parents and [District] were in litigation; and that they "[would] be denied due process rights and sustain harm if [District] attempts to schedule an IEP meeting while due process litigation is pending."

67. Parents' limited participation in the May 28 and August 28, 2009 IEP meetings confirmed their unwillingness to participate in developing any IEP offer that competed with their own position. On May 28, Parents argued extensively for continued placement with [Coutchié], but showed no interest in discussing any alternative to that placement. District team members explained why they believed Student should return to school and receive a full curriculum but there is no evidence that Parents responded to those views. And at the August 28, 2009 IEP meeting, Parents rebuffed all attempts to bring them into a discussion of [District's] proposal on the ground that litigation was pending.

68. Parents' hostility to the development of a competing IEP offer is most apparent in their concealment from the District of the existence and results of the assessments [Coutchié] conducted in late April and early May 2009, and their simultaneous refusal to authorize assessments by [District]. When [Williams] handed [Kevin Marchese] an assessment plan in mid-April, she explained that her purpose was to obtain current information for use in drafting new goals for Student. Parents never informed the District that [Coutchié] would conduct, or had conducted, any assessments, and refused to sign any assessment plan [District presented]. At the May [28], 2009 IEP meeting, District staff reiterated the need for new assessments. Throughout that discussion, Parents, [Coutchié], and [Rosenberg] remained silent about the assessments [Coutchié] had just conducted.

69. Thus the evidence showed that Parents were entrenched in their position that there was only one appropriate placement for Student (with [Coutchié]); they declined to cooperate with the development of any competing proposal; they evaded attending any IEP meeting addressing such a proposal; they refused to discuss [District's] proposal; and they actively obstructed [District's] proposal by withholding information about Student's then-present levels of academic performance.

(ALJ Decision ¶¶ 62-69 (findings).)

The ALJ accurately described the relevant evidence and witness testimony. A preponderance of the evidence supports the ALJ's conclusion that District's failure to have an IEP in effect prior to the first day of the school year did not deny Student a FAPE, since Student remained

in Parents' preferred placement with Coutchié, and District cured the deficiencies in the IEP offer developed at the procedurally invalid August 5, 2009 IEP meeting by holding the August 28, 2009 IEP meeting, which complied with IDEIA procedures. An independent review of the record demonstrates that a preponderance of the evidence also supports the ALJ's conclusion that Parents had a meaningful opportunity to participate in the IEP process at the August 28, 2009 IEP meeting, but chose not to participate because of the pending litigation and their dissatisfaction with the IEP offer District was developing.

### c. Substantive Compliance With the IDEIA

#### i. Goals

Plaintiffs allege in their FAC that "District's offer of FAPE failed to provide objectively measurable goals called for under the [IDEIA.]" (FAC ¶ 74(I).) District argues "the ALJ's . . . finding that the IEP goals were appropriate" "should [be] uph[e]ld," since his findings were "supported by the administrative record[.]" (Mot. 26:10-29:18.)

Under the IDEIA, an IEP must contain a "statement of measurable annual goals, including academic and functional goals, designed to . . . meet the child's needs that result from [his] disability[.]" 20 U.S.C. § 1414(d)(1)(A)(i)(II). An IEP must also contain a statement of the "student's present level of performance[,] . . . which provides a benchmark for measuring the student's progress toward the goals stated in the IEP." Settlegoode v. Portland Pub. Schs., 371 F.3d 503, 508 n.1 (9th Cir. 2004).

The ALJ concluded that "the proposed goals in the IEP offer met Student's needs and would have allowed him to make meaningful

progress." (ALJ Decision ¶ 35 (conclusions).) The ALJ based his

conclusion on numerous factual findings, including the following:

> The only significant defect in the offered goals was that some of them lacked current information on the levels of Student's skill and achievement, which was in part a consequence of Student's absence from a campus. It was also, in part, a consequence of Parents[] withholding . . . [Coutchié's] spring 2009 assessment data, coupled with their refusal to allow new assessments by the District. The District is not responsible for those shortcomings.
>
> . . . The evidence showed that all of the goals in the offered IEP were directly related to Student's needs. Their baselines were derived from the latest information furnished by [Coutchié] if available, or from [District's] last known measurements. . . . The goals were reasonable, measurable, and contained adequate baselines based on the limited information [District] had available to it at the time the IEP was drafted. The goals complied with all legal requirements.

Id. ¶¶ 139-40 (findings).

Plaintiffs do not argue that there are any specific defects in the ALJ's Decision that require this portion of the ALJ's Decision to be reversed. An independent review of the record demonstrates that a preponderance of the evidence supports the ALJ's conclusion that goals complied with the IDEIA's requirements. In addition, the ALJ's conclusion regarding the goals represents his "notions of sound educational policy[,]" to which this court gives "due weight[.]" Van Duyn, 502 F.3d at 817.

### ii. Closing the Gap

Plaintiffs allege in their FAC that "District's offer of FAPE failed to provide . . . any plan to close the gap between Student's present levels of performance [in reading] and [the] goals[.]" (FAC ¶ 74(I).) District argues "[t]he ALJ's finding that the IEP would allow

Student to make educational progress is supported by the administrative record and should be affirmed." (Mot. 29:20-21.)

"While a student's IEP must be reasonably calculated to provide him . . . with educational benefit, school districts are required to provide only a 'basic floor of opportunity.'" Fresno, 626 F.3d at 439 (quoting Rowley, 458 U.S. at 200-01). "Thus, an 'appropriate' public education does not mean the absolutely best of 'potential-maximizing' education for the individual child." Id. (internal quotation marks and citation omitted). However, "Congress did not intend that a school system could discharge its duty under the [IDEIA] by providing a program that produces some minimal academic advancement, no matter how trivial." Id. (internal quotation marks and citation omitted).

The ALJ found, in relevant part:

> The fundamental dispute between the parties relates to the rate at which Student should be expected to progress in language arts. Parents believe that Student cannot have access to grade-level curriculum until his reading [fluency] is brought up to, or near, grade level; that all other subjects should be put aside until he does so; and that Student's reading will not improve adequately with less than three hours a day of individual instruction. [District] believes that two hours a day of individual reading instruction is enough to enable Student to access the rest of the middle school curriculum, which he should now be doing. The opinion evidence was in conflict.

(ALJ Decision ¶ 82 (findings).) The ALJ discussed the hearing testimony and the applicable law and resolved the conflict in opinion in favor of District.

The ALJ specifically found that "[s]everal District witnesses testified credibly that the language arts (reading and writing) portion of [District's] offer is appropriate." Id. ¶ 83. Barbaria testified that

the IEP reflected District's view that "[Student] should be allowed . . . to have some contact with . . . students who . . . were not disabled . . . [and] access to science and math and some of the other programs . . . available at the school site." (Barbaria Test., Hr'g Trans. 178:16-21, Nov. 30, 2009.) Barbaria also testified there were other Students in the school district "who [were] reading below grade level and they [were] functioning, . . . learning, [and] . . . progressing." Id. at 205:15-18.

Cristo testified Student could make progress in reading fluency if his one-on-one reading instruction was reduced from three hours per day to two hours per day, since one-on-one reading instruction provides diminishing returns for any instruction exceeding two hours per day. (Cristo Test., Hr'g Trans. 202:22-203:9, Dec. 8, 2009.) She also testified that two hours per day of one-on-one instruction would allow Student to make "appropriate progress" in reading fluency while "allowing some time for him to meet his other needs, [such as] math . . . [and] science." Id. at 202:5-9 & 203:10-20. The ALJ found Dr. Cristo testified "persuasively and without contradiction." (ALJ Decision ¶ 84 (findings).)

Ludwig, Student's proposed reading instructor under District's IEP offer, also testified that two hours per day of individual reading instruction would allow Student to make progress in reading fluency, "bridge any gaps," and "transition . . . into core curriculum areas." (Ludwig Test., Hr'g Trans. 294:2-295:12, Dec. 1, 2009.) Williams also testified that two hours per day of individual instruction in reading was sufficient. (Williams Test., Hr'g Trans. 235:1-6, Nov. 30, 2009.)

The ALJ also found "[t]wo professionals testified that the reading portion of [District's] offer was inadequate." (ALJ Decision ¶

90 (findings).) Coutchié testified that two hours of individual reading instruction per day would not allow Student to progress at a rate that would allow him to read at grade-level within a year or two. (Coutchié Test., Hr'g Trans. 77:17-19, Dec. 8, 2009.) However, the ALJ did "not give[] [Coutchié's opinion] any weight." (ALJ Decision ¶ 91 (findings).) The ALJ found "[Coutchié] has a significant financial interest in the failure of [District's] IEP offer and the continuation of her own tutoring of Student[, since s]he tutors him three hours every school day at the rate of $90 an hour[.]" Id. The ALJ also found "[Coutchié] was strongly biased in favor of Parents and against [District, and] . . . [h]er animus toward [District] was evident in her testimony." Id. ¶ 92. The ALJ further found:

> [Coutchié's] bias is also evident from her conduct. She proposed to Parents that she, rather than anyone selected by [District] conduct the academic assessments [District] wanted [Williams] to conduct. She deceptively billed those assessments to [District] in a way that ensured she would be paid for them but [District] would not know that she had conducted them. Shortly before the May 28, 2009 IEP meeting, [Coutchié] received an email from [Barbaria] asking for "written reports" about Student, but [Coutchié] did not mention the results of her assessments in her response. Nor did she reveal them at the May 28, 2009 IEP meeting, where District team members spoke of their need for the assessments she had just conducted. She continued to withhold the results from [District] until compelled to produce them under subpoena. . . . This behavior evidences a hostility to [District] and a willingness to manipulate information that make her testimony unreliable.

Id. ¶ 93.

Torgesen testified, *inter alia*, that the IEP would not allow Student to read at grade level by the end of the eighth grade. (Torgesen Test., Hr'g Trans. 68:16-70:9, Dec. 9, 2009.) Torgesen also testified that if "the goal is to continue to accelerate his development[,] . . .

[i]t doesn't seem to . . . [m]ake any sense to switch him from a known intervention—one that we know works . . . —to one [about] which we have no evidence that [it] will work." Id. at 82:8-14.

The ALJ found that Torgesen's "testimony did not suffer from any of the defects of [Coutchié's testimony, but h]is . . . opinions were not persuasive for different reasons." (ALJ Decision ¶ 95 (findings).) The ALJ found:

> [Torgesen] admitted his view [that Student should be able to read at grade-level by the end of eighth grade] reflected a preference, and agreed that his preference was not the only way to provide Student a FAPE. While reasonable people may hold that belief, they may also hold the opposite view. [District] was not required to agree with [Torgesen's] perspective.

> [Torgesen] was concerned only with progress in reading. He discounted Student's need to learn such subjects as math and science as less important than reading. However, California requires a broader range of instruction and curriculum in middle school and for graduation.

> . . .

> [Torgesen] testified that [Coutchié's] intervention should be continued because it was 'a Cadillac' and the 'best possible' program for Student. But a district is not obliged under the IDEA to provide Student with the best possible program; it is required to provide a program that meets a student's needs and allows him an opportunity to make meaningful progress.

> [Torgesen] did not testify that [District's] offer was inappropriate, or that it did not address Student's unique needs. He did not testify that two hours a day of individual reading instruction by a qualified teacher was not enough to allow Student to make meaningful progress under [District's] offer. He did not testify that Student could not access the other elements of the middle school curriculum unless he achieved a rate of progress in reading as rapid as [Torgesen] preferred. Therefore, even taken at face value, [Torgesen's] testimony did not establish that the reading element of [District's] offer would fail to provide Student a FAPE.

Id. ¶¶ 97-102. The ALJ concluded:

> District's . . . offer of a FAPE . . . addressed
> all of Student's unique needs, was reasonably
> calculated to allow him to make meaningful
> educational progress, and therefore would provide
> him a FAPE. The two hours a day of one-to-one
> language arts instruction would be enough to allow
> Student to make substantial progress. Under the
> offered IEP, he would be able to access other parts
> of the general curriculum. . . . District was not
> required to ensure that Student made even faster
> progress in language arts at the expense of all the
> other benefits of middle school.

Id. ¶¶ 34-35 (conclusions).

The ALJ accurately described in his Decision each witness's hearing testimony. The court defers to the ALJ's credibility findings, since Plaintiffs have not demonstrated that the "extrinsic evidence in the record justif[ies] a contrary conclusion[.]" Fremont, 545 F. Supp. 2d at 1003. In addition, an independent review of the record demonstrates that a preponderance of the evidence supports the ALJ's conclusion that District's IEP offer would allow Student to make meaningful progress in reading while accessing other areas of the core curriculum.

Further, the ALJ's conclusion that "District was not required to ensure that Student made even faster progress in language arts at the expense of all the other benefits of middle school" reflects his "notions of sound educational policy," to which this court must give "due weight." Van Duyn, 502 F.3d at 817; ALJ Decision ¶ 35 (conclusions).

## II. DISTRICT'S SUMMARY JUDGMENT MOTION

District seeks summary judgment on the remaining claims in Plaintiffs' FAC, which concern Student's education during the 2008-2009 and 2009-2010 school years. Plaintiffs allege in their remaining claims

that the 2008 Settlement Agreement and IEP required District to provide math instruction, and District breached the 2008 Settlement Agreement (Eleventh claim) and violated § 504 (Third claim) by failing to provide math instruction during the 2008-2009 school year. Plaintiffs also allege District discriminated and retaliated against Plaintiffs in violation of state and federal laws, including § 504, by failing to consistently and timely pay Couchié (Fourth claim); altering the 2008 IEP after Parents signed it (Fifth claim); placing Student in a sixth grade P.E. class during his seventh grade year (Sixth claim); advising Plaintiffs it would cease funding Couchié's services on March 15, 2010 (Seventh claim); excluding Student from extra-curricular activities (Eighth claim); failing to prevent peer harassment of Student (Ninth claim); manipulating the IEP process (Tenth claim); and denying Student a FAPE (Twelfth and Thirteenth claims).

**A. Summary Judgment Standard**

A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case." Thrifty Oil Co. v. Bank of Am. Nat. Trust and Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

When a defendant is the movant for summary judgment on one or more of a plaintiff's claims,

> [the defendant] has both the initial burden of production and the ultimate burden of persuasion on [the motion]. In order to carry its burden of production, the [defendant] must either produce

34

> evidence negating an essential element of the [plaintiff's claim] or show that the [plaintiff] does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. In order to carry its ultimate burden of persuasion on the motion, the [defendant] must persuade the court that there is no genuine issue of material fact.

_Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc._, 210 F.3d 1099, 1102 (9th Cir. 2000) (citations omitted). If the moving party's initial burden is satisfied, "the non-moving party must set forth, by affidavit or as otherwise provided in [Federal] Rule [of Civil Procedure] 56, specific facts showing that there is a genuine issue for trial." _T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n_, 809 F.2d 626, 630 (9th Cir. 1987) (citation and internal quotation marks omitted). The "non-moving plaintiff cannot rest upon the mere allegations or denials of the adverse party's pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." _Estate of Tucker ex rel. Tucker v. Interscope Records, Inc._, 515 F.3d 1019, 1030 (9th Cir. 2008) (citation and internal quotation marks omitted).

Further, Local Rule 260(b) requires:

> Any party opposing a motion for summary judgment or summary adjudication [must] reproduce the itemized facts in the [moving party's] Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial.

If the nonmovant does not "specifically . . . [controvert duly supported] facts identified in the [movant's] statement of undisputed facts," the nonmovant "is deemed to have admitted the validity of the

facts contained in the [movant's] statement." <u>Beard v. Banks</u>, 548 U.S. 521, 527 (2006).

> Because a district court has no independent duty to scour the record in search of a genuine issue of triable fact, and may rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment, . . . the district court . . . [is] under no obligation to undertake a cumbersome review of the record on the [nonmoving party's] behalf.

<u>Simmons v. Navajo Cnty., Arizona</u>, 609 F.3d 1011, 1017 (9th Cir. 2010) (citation and internal quotation marks omitted).

Evidence must be viewed "in the light most favorable to the non-moving party," and "all reasonable inferences" that can be drawn from the evidence must be drawn "in favor of [the non-moving] party." <u>Nunez v. Duncan</u>, 591 F.3d 1217, 1222-23 (9th Cir. 2010).

**B. District's Objections**

District argues "each of [Plaintiffs'] exhibits [in support of their opposition to the summary judgment motion] is not properly authenticated and [is] properly excluded on that basis." (Reply 19:10-11.) Plaintiffs' exhibits are comprised of pages from the 2008 IEP; Student's standardized test results; letters and emails between Parents and District, including emails that District also submitted as evidence in support of its motion; and a police report describing battery of Student on school grounds. (Pls.' Exs. in Opp'n.) Since the challenged documents are communication between the parties, part of the administrative record, or from a government agency, District has not demonstrated that the documents should be excluded for purposes of this motion. <u>See</u> <u>Orr v. Bank of Am.</u>, 285 F.3d 764, 777 n.24 (9th Cir. 2002) ("[Rule 56] does not require that all documents be authenticated through personal knowledge when submitted in a summary judgment motion. For

instance, documents attached to an exhibit list in a summary judgment motion [may] be authenticated by review of their contents if they appear to be sufficiently genuine."); Alexander Dawson, Inc. v. N.L.R.B., 586 F.2d 1300, 1302 (9th Cir. 1978) ("The content of a document, when considered with the circumstances of its discovery, is an adequate basis for . . . admitting it into evidence."). Therefore, these documents are not excluded.

District filed numerous additional objections to evidence Plaintiffs filed in support of their opposition brief. District also filed an objection to Plaintiffs' Response to District's Statement of Undisputed Facts. However, these objections concern evidence and information that are not material to decision on the motion; therefore, the merits of those objections need not be reached.

## C. Relevant Facts[1]

### 1. Interference With the 2008 Settlement Agreement and IEP

The 2008 Settlement Agreement required District to contract with an independent reading specialist and fund "fifteen (15) hours per week of direct one-to-one reading intervention services to [Student]" for the 2008-2009 school year. (A.R. 70-71.) District and Coutchié did not enter into a contract for the 2008-2009 school year. (Coutchié Test., Hr'g Trans. 116:8-1, Dec. 8, 2009.) District failed to timely pay Coutchié on several occasions during the school year, and Parents paid her instead. (L. Marchese Dep. 48:19-51-23.) However, by July 2009, District had paid for all of Coutchié's services for the 2008-2009

---

[1]   Both parties inaccurately describe evidence and assert legal conclusions as "uncontroverted facts" in their statements of undisputed and additional facts. Therefore, the facts in this section that do not come from the parties' statements of undisputed and additional facts are taken from the evidence and are not controverted by other evidence in the record.

school year by paying her directly and reimbursing Parents for amounts they paid. Id. at 51:24-52:15.

### 2. Peer Harassment

Student experienced five incidents of peer harassment on school grounds between December 8, 2008 and May 13, 2009. (Pls.' Exs. in Opp'n, Ex. G.) Lyndi Marchese and Laura Benjamin ("Benjamin"), Student's P.E. teacher, communicated by email concerning the first four incidents. Id.

On December 8, 2008, Lyndi Marchese sent an email to Benjamin stating that a student named "Fender" "called [Student] 'stupid' and asked [him several times] to tell him what disability he has." (Pls.' Exs. in Opp'n, Ex. G.) Lyndi Marchese also stated Fender hit Student when he did not answer Fender's questions. Id. Benjamin stated in a reply email the same day that she would "keep an eye on the situation and intervene if necessary." Id.

On January 7, 2009, Benjamin sent an email to Lyndi Marchese concerning an incident that occurred the day before involving Student and two other students. Id. Benjamin stated in the email that she spoke to the counselor about the incident and the counselor intended to meet with the two other students. Id. Benjamin also stated she and another teacher, Mr. Coble, spoke to the two other students "about bullying, disrespect etc." Id. Benjamin further stated that the two other students would not be allowed to work together in a group or with Student in the future. Id. Lyndi Marchese responded in an email to Benjamin the same day, stating:

> I really appreciate all that you did in regard to
> yesterday!!! Mr. Coble had a wonderful relationship
> with our older son and was one of his favorite
> teachers. . . . I get so frustrated with this
> "icky" behavior that some kids demonstrate. . . .
> We appreciate all the consideration you gave to the

1             situation. . . . Again, thank you for all that you
             have done and we feel fortunate to have such a
2             great teacher for [Student].

3  Id.

4        On January 8, 2009, Lyndi Marchese sent an email to Benjamin

5  describing an incident that occurred in the locker room that day, and

6  stating:

7             [Student] says he feels that the kids may gang up
             on him now. I do not want [him] to be concerned
8             that he will be verbally or physically attacked by
             this or any other student or ostracized due to this
9             boy's instigation. This just does not seem fair to
             [Student] and does not create a safe environment
10            for him. I think at this point we need to assume
             that the measure used with this particular boy were
11            not effective. I know you are doing your best and
             that Jr. High can be rough, but this is not
12            acceptable at so many levels.

13  Id. Benjamin stated in a reply email the same day that she was not aware

14  of the incident until Lyndi Marchese reported it. Id. Benjamin also

15  stated she informed the school counselor and Mr. Coble of the incident.

16  Id. In another email later that day, Benjamin stated that the assistant

17  principal "met with [the other] boys and told them that any further

18  teasing, etc[.] will result in point loss and further consequences." Id.

19  Benjamin further stated she "wished [she] could do more to help

20  [Student]." Id.

21        On March 20, 2009, Lyndi Marchese emailed Benjamin about

22  another incident, stating:

23            [Student] is really frustrated! Fender kept
             punching and touching [him] . . . . He was afraid
24            to go to you . . . . He feels that Fender will
             "beat him up" after [Student] reports him.
25            [Student] has come home now on several days telling
             me he could handle it. He has tried everything and
26            cannot. This boy is determined to hit and touch
             [Student] at any time he can get away with
27            it. . . . [Student] tells me leaving to go tell you
             causes him to be embarrassed but also makes Fender
28            more determined to continue. He feels that no one
             is in control of Fender and he punched him on the

> arms, chest, and when he got out of the way he was
> punched on the back. . . . I will not let this
> continue and am frustrated that it is not
> controlled. The boy should be removed from the
> class or given an aide to assist him.

Id. Benjamin replied in an email three days later:

> I'm sorry that we're still having this
> conversation. I'm at a loss [because] Fender is
> often sneaky about these behaviors as I haven't
> seen it lately. I will make sure that he and
> [Student] are not together or near each other as
> much as I possibly can for the rest of the year. I
> will remind Fender that he is not to touch or act
> like he's going to touch another student and that
> doing so will result in a detention, class
> suspension, and so on.

Id.

On May 13, 2009, a different student punched Student in the arm, which caused swelling and a bruise that was visible for several days. Id. (Placer County Sheriff's Department police report, May 14, 2009.) "[T]he School vice-principal undertook an investigation of the incident[,] . . . found that the other student participated in 'willful use of force' and suspended him for five days." (Dep't of Educ. Office of Civil Rights Decision, No. 09-09-1346, at 4 (Mar. 5, 2010), attached as Ex. A to Gutierrez Decl.).

### 3. P.E. During Student's Seventh Grade Year

"Student was enrolled in a sixth grade P.E. class at Creekview Ranch Middle School" for the first part of his seventh grade year (2009-2010). (Def.'s Statement of Undisputed Facts ("Def.'s SUF") # 56.) "Student's individual reading instruction with [Coutchié] was provided in Davis, California, approximately 45 minutes from [Creekview Ranch Middle School], and . . . Student was not able to return to school from his instruction with [Coutchié] until eighth period[.]" Id. # 57. Further, "none of the middle schools in the District offered seventh

grade P.E. during eighth period." Id.; Barbaria Decl. ¶ 7. "District offered [seventh grade P.E. at] alternative[ times to Parents] . . . , but [they] refused these offers." (Def.'s SUF # 58.)

Plaintiffs filed a complaint with CDE concerning Student's placement in sixth grade P.E. (CDE Compliance Report, Oct. 9, 2009, Pls.' Exs. in Opp'n Ex. F; A.R. 979.) CDE found:

> District failed to meet the requirements of 34 CFR Section 300.518(a). . . . District failed to continue the Student's placement in the appropriate grade level during the pendency of the due process proceeding. . . . [S]tudent should have proceeded to the next grade level and corresponding classes within that grade."

Id. at 9. CDE ordered District to "coordinate[] and fund[ a] membership in a health club or other community recreational services" by November 30, 2009 "to make up for the seventh grade P.E. . . . District [had] not provided from the beginning of the 2009-2010 school year." Id. "Plaintiffs requested that instead of a gym membership, [District] fund Student's attendance at a Martial Arts class." (Barbaria Decl. ¶ 8.) District "gave . . . [Student] the money . . . to attend his martial arts class in lieu of [P.E., but] . . . this was only done for part of the year." (L. Marchese Dep. 7:11-15.) "[District] put [Student] again in a sixth grade [P.E.] class" and did not pay for the martial arts class until January or February 2010. Id. at 7:16-25.

**D. Discussion**

**1. California Government Claims Act**

District seeks summary judgment on Plaintiffs' state claims, arguing "there is no genuine issue of material fact" concerning the issue of whether Plaintiffs complied with the California Government Claims Act ("Government Claims Act") before "bring[ing] these . . . claims against [District], a public entity as defined in Government Code

section 900.4." (Mot. 36:21-37:1 & 37:21-24.) Plaintiffs do not address this portion of District's motion in their opposition brief.

"Under the [Government Claims A]ct, . . . no suit for 'money or damages' may be brought against a public entity until a written claim therefor has been presented to the public entity and either has been acted upon or is deemed to have been rejected." Alliance Fin. v. City & Cnty. of San Francisco, 64 Cal. App. 4th 635, 641 (1998) (citing Cal. Gov. Code § 945.4). "Compliance with the [Government Claims Act] is mandatory; and failure to file a claim is fatal to the cause of action." Hacienda La Puente Unified Sch. Dist. v. Honig, 976 F.2d 487, 495 (9th Cir. 1992) (internal quotation marks and citation omitted).

Here, Plaintiffs have not demonstrated compliance with the Government Claims Act or that they should be excused from compliance, and this "failure . . . is fatal to" their state claims. Id. Therefore, District's summary judgment motion on Plaintiffs' state claims is GRANTED.

**2. Failure to Provide Math Instruction During 2008-2009 School Year (Third Claim)**

District argues Plaintiffs' § 504 claim alleging that District failed to provide Student with math instruction during the 2008-2009 school year "is barred by the terms of the 2008 Settlement Agreement." (Mot. 39:2-3.) District argues the 2008 Settlement Agreement and IEP "specifically provided for individual reading instruction [and P.E.] and did not contain any math instruction." Id. at 39:6-7. Plaintiffs counter that the 2008 IEP required math instruction that District failed to provide. (Opp'n 25.) Plaintiffs argue "District personnel understood that math instruction was required under the [2008] IEP, and they communicated such openly and repeatedly." Id.

"The interpretation of a settlement agreement is governed by principles of state contract law." <u>Botefur v. City of Eagle Point, Or.</u>, 7 F.3d 152, 156 (9th Cir. 1993) (citation omitted). Here, California law governs the dispute over the 2008 Settlement Agreement, since the Agreement itself states that it "shall be interpreted, enforced and governed by the laws of the State of California and the [IDEIA]." (A.R. 73.) "'The fundamental goal of contract[] interpretation is to give effect to the mutual intention of the parties. If contractual language is clear and explicit, it governs.'" <u>Id.</u> (quoting <u>Bank of the W. v. Superior Ct.</u>, 2 Cal. 4th 1254, 1264 (1992)). Further, "[a] written contract must be read as a whole and every part interpreted with reference to the whole." <u>Shakey's Inc. v. Covalt</u>, 704 F.2d 426, 434 (9th Cir. 1983) (citation omitted). "Preference must be given to reasonable interpretations as opposed to those that are unreasonable[.]" <u>Id.</u> (citation omitted).

The parties dispute whether the 2008 Settlement Agreement and IEP required math instruction during the 2008-2009 school year. The 2008 Settlement Agreement provides, in relevant part:

> A. For the 2008-2009 school year District will contract with Suzanne Coutchié, Educational Therapist/Reading Specialist, to provide fifteen (15) hours per week of direct one-to-one reading intervention services to [Student.]
>
> . . .
>
> C. For the 2008-2009 school year [Student] shall attend the Creekview Ranch Middle School on a significantly reduced schedule to allow time for his participation in the services described above. The parties agree that [Student] shall attend one period of P.E. (8th period which commences at 1:10 p.m.), five (5) days per week, with normal site attendance policies/exceptions applying.

(A.R. 70-71.)

1    The 2008 IEP included the following goals: decoding words,

2 written language, written communication, reading fluency, math, and

3 social interactions. Id. at 315-21. However, the 2008 IEP specifically

4 states:

5         In order to resolve the dispute between [District
          and Plaintiffs] (pursuant to the settlement
6         agreement reached between [them]), [District]
          agreed to fund 15 hours per week of individual
7         instruction following [District's] academic
          calendar and 80 hours of extended year services
8         from the educational specialist selected by the
          parents. [Student] will attend Creekview Ranch
9         Middle School for one period per day—8th period for
          [P.E.] . . . *The proposed goals that were written*
10        *last spring cannot be implemented due to the*
          *placement with the educational specialist.* New
11        goals will be drafted by the educational therapist
          and presented at the annual IEP meeting.

12

13 Id. at 325 (emphasis added).

14    When the 2008 Settlement Agreement and IEP are read as a

15 whole, they do not support a reasonable interpretation that the parties

16 agreed Student should receive math instruction during the 2008-2009

17 school year. The 2008 Settlement Agreement and IEP enumerate in detail

18 the types and amount of instruction the parties agreed Student should

19 receive: fifteen hours per week of one-on-one reading instruction with

20 Coutchié, and one period of P.E. during eighth period at the school site

21 five days per week. Id. at 70-71 & 325. Although the 2008 IEP includes

22 math goals, it also states that those goals could not be implemented

23 because of the placement with Coutchié. Therefore, Plaintiffs have not

24 demonstrated that the language in the 2008 Settlement Agreement and IEP

25 supports their position that these documents required Student to receive

26 math instruction.

27    District also argues "Plaintiffs waived any right to challenge

28 whether [District] needed to provide Student with math instruction

44

during the 2008-2009 school year," since "[t]he 2008 Settlement Agreement includes a waiver of all claims and issues, past, present, or future, from May 5, 2006 through the date of the execution of the Settlement Agreement on October 21, 2008[.]" (Mot. 39:12-17.) Plaintiffs do not address this portion of District's motion.

The 2008 Settlement Agreement provides, in relevant part:

> Upon execution of this Agreement by all parties, [Plaintiffs] agree[] to waive their right to convene an IEP meeting to make the necessary adjustments to [Student's] IEP to reflect the terms of this Agreement. District shall make the necessary revision to [Student's] IEP documentation and shall forward the same to [Plaintiffs] for their review and execution. Assuming the IEP documentation reflects the terms of this Agreement, [Plaintiffs] agree to consent to the IEP and execute [it.]
>
> . . .
>
> [Plaintiffs] hereby irrevocably and unconditionally release and forever discharge District with respect to any and all claims and issues which were preliminarily raised, or which could have been later raised, in a lawsuit, or which the parties hereto have or may ever have had against each other arising out of the dispute with respect to the time period May 5, 2006 and through the date of execution of this Agreement . . . . All such claims are forever barred by this Agreement regardless of the forum in which it may be brought, including, without limitation, claims under the state and federal laws.

(A.R. 73.) Parents signed the 2008 Settlement Agreement on October 9, 2008 and the IEP on October 28, 2008. Id. at 77 & 329.

The uncontroverted evidence demonstrates that Plaintiffs consented to the 2008 Settlement Agreement and IEP, which did not require math instruction, and waived their right to challenge the lack of math instruction. Therefore, this portion of District's summary judgment motion is GRANTED.

//

**3. Interference With Implementation of Student's IEP (Fourth Claim)**

District seeks summary judgment on Plaintiffs' § 504 claim in which they allege District interfered with implementation of the 2008 IEP. District argues there is no genuine issue of material fact concerning its position that it did not interfere with Student's right to a FAPE. (Mot. 39:24-28.) Section 504 prescribes that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of . . . his disability, be excluded from . . . participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). "Section 504 applies to all public schools that receive federal financial assistance." Mark H. v. Lemahieu, 513 F.3d 922, 929 (9th Cir. 2008) (citing 29 U.S.C. § 794(b)(2)(B)). "To establish a violation of § 504 . . . , [Plaintiffs] must show that (1) [Student] is handicapped . . . ; (2) [Student] is otherwise qualified for the benefit or services sought; [and] (3) [Student] was denied the benefit or services solely by reason of [his] handicap[.]" Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002) (citation omitted).

District argues "Plaintiffs cannot establish [District interfered with implementation of the 2008 IEP.]" (Mot. 39:26-40:7.) Plaintiffs counter that "by failing to timely and directly pay [Coutchié,] . . . District was actually interfering with [Student's] IEP and the provider that was to provide those services, because without timely payment, the provider would terminate or suspend (which occurred) her special education services." (Opp'n 25-26.) Plaintiffs further argue:

> Parents were forced to cover for [District] so as to maintain [Coutchié's services] and avoid her quitting. But for [Parents'] mitigation, [Coutchié] would have quit. [District] knew this or should

46

1        have known that quitting was the probable
eventuality of non-payment and late payment. . . .

2        These facts . . . support [finding] that the
District knew that its actions were actually

3        interfering with [Student's] education[.]

4  Id. at 27.

5         However, Plaintiffs have not proffered evidence that the

6 payment delays prevented Student from receiving the services required

7 under the 2008 Settlement Agreement and IEP for the 2008-2009 school

8 year. The uncontroverted facts demonstrate that Parents paid for

9 Coutchié's services on several occasions during the 2008-2009 school

10 year when District failed to timely pay her. However, the uncontroverted

11 evidence also demonstrates that by July 2009, District had paid for all

12 of Coutchié's services by paying Coutchié directly and by reimbursing

13 Parents. Since Plaintiffs have not demonstrated there is a genuine issue

14 of material fact regarding whether District interfered with Student's

15 FAPE, this portion of District's motion is GRANTED.

16      **4. Alteration of 2008 IEP (Fifth Claim)**

17         District argues "Plaintiffs cannot establish a violation of

18 Section 504 under the facts alleged and the evidence supporting the

19 alleged facts" concerning their claim that District altered Student's

20 2008 IEP. (Mot. 41:14-26.) Plaintiffs counter that "[t]here is a triable

21 issue of material fact on the [2008 IEP] alteration issue because

22 [District's] own documents show" that District circulated during the

23 2008-2009 school year a different version of the 2008 IEP that contained

24 three additional pages. (Opp'n 28-29.) Plaintiffs further argue

25 District's inclusion of these additional pages in the 2008 IEP "[was]

26 intentional, pervasive and otherwise part of a policy of ongoing

27 systematic records alteration." Id. at 38.

28  //

Plaintiffs submitted the three additional pages they argue District added to the 2008 IEP in support of their argument that District's alteration of the 2008 IEP violated § 504. (Pls.' Exs. in Opp'n, Ex. E.) Two of the added pages merely restate information that appears on other pages in the 2008 IEP. Id. Another page contains numerous spaces for information, but none of the spaces contain data. Id. The addition of these three pages has not been shown to have any bearing on benefits or services Student was otherwise qualified to receive. See Lovell, 303 F.3d at 1052 (requiring plaintiffs to demonstrate, inter alia, that "[Student] was denied the benefit or services solely by reason of [his] handicap"). Therefore, this portion of District's summary judgment motion is GRANTED.

**5. Remaining § 504 Claims**

District seeks summary judgment on Plaintiffs' remaining § 504 claims, arguing Plaintiffs cannot obtain monetary damages, which is the only relief they seek for their remaining claims. (Mot. 47:16-25.) "[A] plaintiff seeking monetary damages under Section 504 must prove that defendants acted with deliberate indifference." C.B. v. Sonora Sch. Dist., 691 F. Supp. 2d 1123, 1158 (E.D. Cal. 2009) (citing Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001)). "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that . . . likelihood." Duvall, 260 F.3d at 1139.

> Because in some instances events may be attributable to bureaucratic slippage that constitutes negligence rather than deliberate action or inaction, [the Ninth Circuit] ha[s] stated that deliberate indifference does not occur where a duty to act may simply have been overlooked . . . . Rather, in order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than

negligent, and involves an element of deliberateness.

Id.

District argues "the record clearly establishes [it] did not act with deliberate indifference toward Student." (Mot. 47:16-25.) District further argues "Plaintiffs [only] alleged deliberate indifference in . . . two of their [claims]–the Sixth alleging violations of [§] 504 based on placing Student in Sixth grade P.E. for the first part of the 2009-2010 school year and [the] Ninth based upon alleged peer harassment of Student." Id. at 47:25-48:1.

Plaintiffs did not address the portion of District's motion which challenges Plaintiffs' Third, Seventh, Eighth, Tenth, Twelfth, and Thirteenth claims, and failed to submit evidence from which a reasonable inference can be drawn that District acted with deliberate indifference concerning these claims. Therefore, District's summary judgment motion on Plaintiffs' Third, Seventh, Eighth, Tenth, Twelfth, and Thirteenth claims is GRANTED.

### a. P.E. During Seventh Grade (Sixth Claim)

District argues Plaintiffs cannot demonstrate Defendants acted with deliberate indifference when it placed Student in a sixth grade P.E. class during his seventh grade year, since "there was no Seventh Grade P.E. class in the afternoon and Parents refused to switch Student's tutoring schedule to the afternoon to accommodate a morning P.E. class." (Mot. 48:2-5.) District also argues that "[i]n response to a CDE complaint filed by Plaintiffs regarding Student's placement in a sixth grade P.E. class during seventh grade, CDE ordered [District] to fund a gym membership [for Student.]" Id. at 48:5-9. District further argues it funded Student's martial arts class instead of a gym membership at Parents' request. Id. Plaintiffs counter that despite

CDE's order, District delayed funding for Student's martial arts class and kept him in sixth grade P.E. until January or February 2010. (Opp'n 40.)

The evidence demonstrates that "Student was placed in sixth grade P.E. during the 2009-2010 school year because there was no seventh grade P.E. class in the afternoon and Parents refused to switch Student's tutoring schedule to the afternoon to accommodate a morning P.E. class." (Barbaria Decl. ¶ 7.) Parents filed a complaint with the CDE concerning Student's placement in sixth grade P.E. during his seventh grade year. (CDE Compliance Report, Oct. 9, 2009, Pls.' Exs. in Opp'n Ex. F.) CDE issued a report in which it concluded that District "failed to meet the requirements of 34 CFR Section 300.518(a)[, since] . . . [S]tudent should have proceeded to the next grade level and corresponding classes within that grade." Id. CDE ordered District to "coordinate[] and fund[] membership [for Student] in a health club or other community recreational services" by November 30, 2009 "to make up for the seventh grade P.E. . . . District [had] not provided from the beginning of the 2009-2010 school year." Id. Plaintiffs requested that District fund Student's martial arts class instead of a private gym membership, which District did beginning in January or February 2010. (Barbaria Decl. ¶ 8; L. Marchese Dep. 7:11-15; L. Marchese Dep. 7:11-15.)

This evidence does not support drawing a reasonable inference that District was deliberately indifferent to Student's need for physical education. Rather, the evidence demonstrates District initially placed Student in sixth grade P.E. class because that was the only P.E. class available in the District during eighth period, and Parents refused District's offers to place him in seventh grade P.E. classes

offered at other times. Further, District funded Student's martial arts class at Parents' request. In addition, nothing in the record indicates that the martial arts instruction Student received did not "make up for the seventh grade P.E. . . . District [had] not provided from the beginning of the 2009-2010 school year." (CDE Compliance Report, Oct. 9, 2009, Pls.' Exs. in Opp'n Ex. F.) Therefore, this portion of District's summary judgment motion is GRANTED.

### b. Peer Harassment (Ninth Claim)

District argues "the uncontroverted facts . . . establish beyond question that [District] was not deliberately indifferent to Student's plight [concerning peer harassment,] . . . [since] Student's teacher responded to each peer harassment incident or communication by speaking directly with the [other s]tudents involved and bringing [in] the school counselor to provide additional support." (Mot. 44:27-45:2.) Plaintiffs counter that "[t]here is a triable issue of material fact [on the issues of whether District] knew and understood that [Student] was the target of continuing and systematic peer harassment, and [whether] despite the numerous requests to stop the harassment after it got physical, [District] was deliberately indifferent." (Opp'n 52.)

The evidence evinces that Student experienced five incidents of peer harassment between December 8, 2008 and May 13, 2009. (Pls.' Exs. in Opp'n, Ex. G.) Benjamin was not aware of the first, third, or fourth incidents until Lyndi Marchese reported them to her. Id. Benjamin, Mr. Coble, the school counselor, or the assistant principal spoke to the offenders following the second, third, and fourth incidents. Id. Further, Lyndi Marchese was satisfied with the assurance Benjamin gave her after Lyndi Marchese informed Benjamin about the first incident; specifically, Benjamin stated she would "keep an eye on the

situation and intervene if necessary." (Pls.' Exs. in Opp'n, Ex. G.) In addition, Benjamin prohibited the offending student from working with Student after the second and fourth incidents. Id. Further, the assistant principal suspended the offender involved in the fifth incident for five days. (Dep't of Educ. Office of Civil Rights Decision, No. 09-09-1346, at 5 (Mar. 5, 2010), attached as Ex. A to Gutierrez Decl.).

This evidence evinces that District "took . . . affirmative steps . . . to address the incidents of harassment involving [Student]" and "does not give rise to an inference that [District] was deliberately indifferent to [Student's] situation or that it had an attitude of permissiveness that amounted to discrimination." S.S. v. E. Ky. Univ., 532 F.3d 445, 455-56 (6th Cir. 2008). Therefore, this portion of District's motion is GRANTED.

### III. CONCLUSION

For the stated reasons, the ALJ's Decision is AFFIRMED,[2] and District's summary judgment motion is GRANTED. Judgment shall be entered in favor of Defendant.

Dated:  September 7, 2012

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge

---

[2]    In light of this order, District's motion to compel expert deposition testimony is DENIED as moot. (ECF. No. 64.)